Our last case for argument this afternoon is U.S. v. Burks. Let's give counsel a few minutes. You don't have to rush. Take your time. We'll give you a few minutes to set up. All right. When you're ready, counsel. Good morning, Your Honors. I'm Carl Gunn. I'm representing Mr. Burks. I'm going to try to save four minutes for rebuttal. I'll try to keep track of my time. In case time gets eaten up by the other issues and because I think it's really very clear, I want to start by just briefly addressing the obstruction of justice issue because I don't want that to get swallowed up. You have two cases that are almost directly on point. You have cases with facts that are, if anything, worse than the facts here. You have the Madera-Gallegos case where the defendants had, quote, You have the Stites case where there was also a flight from the jurisdiction and the defendant was using aliases. You don't have flight from the jurisdiction here. You don't have aliases here. So I think at the very least the sentence makes a big case.  I'm sorry, Your Honor? Do you think it would make a difference in his sentence? That's what I was just going to ask. I think it very well might, Your Honor. Well, the judge went down to 220. Right, but there's case law in this court that says it's not harmless error, and I think it might make a difference. I think Judge Hatter would be starting from a different starting point, which is what the Supreme Court cases about harmless error in the guidelines talked about. Obviously, I'd like to see much more than just the sentence get vacated. But what do you do with the mandatory minimums here? Well, the mandatory minimum is 15 years if the convictions stand. Okay, so mandatory minimum of 20 with the enhancement. I don't believe there's mandatory minimum. He got less than 20, Your Honor. There's no mandatory minimum of 20. Okay, so what did he get? He got 220 months. 220 months, which is? A little less than 18 years or something, I think. And you're saying is that without the enhancement, the guideline would have been 15 years? Oh, I'm sorry. You mean the obstruction of justice enhancement? Yes, yes. No, the guidelines would have been still about 220 months. I think that's what the question both Judge Bias and I were asking. So if we take out the enhancement, he's still got a sentence at the guideline, right?  But, Your Honor, you're going instead of a base of 360 to life, you'd have a base of 200-something to 200-something. Not a variance, but you're relying on that line of cases that says wrong starting point. Correct. Could possibly make a difference. Correct. Unless the judge says something like this is the sentence I can give either way. I mean, I think it's pretty clear you can't find. And the other point here is the government hasn't argued harmless here. And this court generally does not bring harmless here upon its own. So you have those two considerations here, I think. The reason the government didn't argue it, I think, is the Supreme Court cases easily dispel that. Let me just make one thing clear with respect to this issue. I don't even want to get to the others. The indictment had been – the grand jury had returned an indictment, but it had not yet been served on him. Is that correct? Well, you don't usually serve an indictment. Well, I mean, the arrest warrant had not been issued. The warrant had been issued. The arrest warrant had not been issued. Unlike the – I believe it's Modelo – I may have the name wrong – case that's distinguished in Stites and Madera-Gallegos, this is not a case where he'd been arrested in the warrant and released with the understanding that he should return. And that's what makes that case the not controlling case and the cases I cite the controlling cases. And I know you wanted to start with this, and I know you have other things to deal with, but now you've got me interested. On this count – Maybe I shouldn't have said anything else. Maybe you're persuasive on it. But on this count, as I recall the evidence – or on this enhancement, as I recall the evidence, he fled from a hotel – he left from a – fled from a hotel room when he thought that the police were outside to arrest him, or a hospital room, am I wrong? No, you're right. That was an allegation in the suppression hearing, but that wasn't any basis for the obstruction of justice enhancement. So, no, what was the evidence concerning his absenting himself? Basically that he moved somewhere and sort of just lived in a cousin's basement. That was after he served his time on the state sentence. Yeah, after he served time on the – the hotel thing was five years in the past. And a suggestion that law enforcement tried to find him through some relative. So why, on this record, given the standard review, why is it unreasonable for us to conclude that the district court made an inference that he purposefully evaded arrest because they tried to but couldn't find him? Do you think that's too much of a stretch? Your Honor, that's not enough under the Stites case and the Madera-Gallegos case. Simply sort of hiding from the police and not turning yourself in is not enough to be obstruction of justice. That loses you acceptance of responsibility, absent something else, but it's not enough under Stites. In Madera-Gallegos and Stites, the defendants fled the jurisdiction and in one case used aliases. In another case went to a foreign country, and that wasn't enough. So I don't think you can say there's enough here. I want to make sure that you address the Floretta issue. That was going to be the next issue I wanted to move on to, Your Honor. I think the first point we have here is it is crystal clear that the reason the district court gave for denying self-representation is improper. It's an improper basis. You don't tell defendants they can't represent themselves because they'll do a horrible job at it. You're not capable of it, and that's the reason the judge gave here. I think that's a strong argument. Doesn't your client have to make an unequivocal request for self-representation before we even get into the Floretta analysis? Floretta says that, and we have a bunch of cases. If the request is equivocal and if it's for purposes of delay, which are the two arguments the government makes. Well, those are two separate problems. Right, right. So just focus on unequivocal. There's two reasons you can't rely on that here, Your Honor. The first of all is I give Your Honors three different cases that say this court doesn't go out on its own and figure out alternative bases. No, but those cases deal with when the whole Floretta right is triggered. The Supreme Court tells us that your Floretta right is not triggered until you make an unequivocal request for self-representation. Right. So then the judge's reasons for turning you down are the reasons, and we can't make up other reasons. Let me just finish so you can respond to it. That's what I read those cases as saying. My question is, are we in Floretta land here at all? Because your client says, well, maybe I should be representing myself, or you're telling me I can't represent myself. But he never says, I want to represent myself. In fact, he doesn't even say, I want to fire my lawyer. And so part of my problem is I'm just not sure I see what I think is necessary to trigger the whole Floretta inquiry, which is an unequivocal request. So respond to that for me. Let me respond, Your Honor. There is a request. Once there's a request, then you look at three factors, one of which is whether the request is equivocal. In the Kieferov, the case I cite, and I think the two habeas cases I cite as well, there was an argument made by the government that the request was equivocal. And this court didn't say, no, it wasn't unequivocal. The court said, we're not going to get into that. And the court gave reasons that really apply here. First of all, they talked about this is a really – Can I find what you just said on the face of those cases? The government argued that there – or is that you're doing that from personal knowledge? No, no, I'm not doing that from personal knowledge, Your Honor. So when I read those cases, you think the court says, we don't care whether the request was equivocal or not?  In the Kieferov, yes, for sure, and I believe the other two cases as well. And there's two reasons for that, Your Honor. First of all, you're getting into this complex factual inquiry that appellate judges just aren't equipped to handle. But when it's not facially unequivocal, doesn't that just end the inquiry? Your Honor, I – maybe if the record would compel a conclusion and any contrary conclusion would be clearly erroneous to find it unequivocal. But I don't think that record is here yet. The district court, the district court who was the person there, he took it as a request. He took it as a request and said, but no, I'm not going to allow it because you're not capable of representing yourself. So the one judicial officer who was there took it that way. So I think at the very least, Your Honor, when there's – and look at the factual record here. The factual record here is so complicated that the government has six pages of factual background on that issue in its brief. You have six pages of facts that Your Honors are going to have to analyze. You have a district judge who took it as a request and simply said no for the wrong reason. And I don't think in those circumstances an appellate court can or is equipped to analyze whether it was equivocal or unequivocal. You had to be there. And the one judge who was there took it as a request. Let me ask you this, counsel. Go ahead, please. If you read that portion of the transcript where I might as well represent myself because I don't understand what's going on anyway, that in and of itself may trigger the normal Faretta advisements. But if you back up and read the entirety of those portions of the transcript, it provides a different context, right? Because his issue really is I was expecting this witness to show up, and now at the last minute you're telling me the witness is not here. And that was really kind of the source of his unhappiness. Even on a cold record like this, we have the benefit of all that context to make a determination as to whether it's equivocal, don't we? Two responses, Your Honor. First of all, your words say if we back up and look at the record, that's what a district court does. And that's where, you know, in the first case you were talking about demeanor, that's where a district court who was there and who was looking at the case makes the best judgment, number one. Second of all, there's two possible scenarios here. One is I guess he really didn't mean it. He was just frustrated because the victim wasn't here. The other is, and this goes to the whole point of Faretta, which is defendant autonomy. The other point was if he wasn't going to get more time to get the victim there, what the heck? I'll just represent myself. At least then, in his own words, I get to speak for myself. And it may be a really good example of where defendant autonomy that Faretta's all about was important because for rightly or wrongly, he basically had given up hope because the victim wasn't going to be there. And so he said, well, at the very least, I'll be able to speak for myself. What do we make of counsel's representation to the court that it doesn't seem like he really meant it? Counsel did that without being able to speak to him about it because counsel said when he went back, the defendant refused to speak to him. So counsel's just speculating on the record the same way your honors are and or the district court saw it differently when he treated it as a request. I will suggest this. Counsel took it seriously enough that he went back to try to ask Mr. Burks about it, and counsel didn't have any better knowledge once he'd gone back because Mr. Burks didn't speak to him. He went back and told the judge that he didn't think that Mr. Burks really wanted to represent himself. Right, but he didn't base that on anything different than the judge had in front of him, and the judge had taken it seriously because he said Mr. Burks wouldn't meet with him. So when he went back, it's not like he got anything additional information. And am I correct that throughout the trial this issue never came up again? Yes, but there's not much point. The voir dire started immediately after that. What do you think Judge Hatter should have done here? I think what Judge Hatter should have done is he should have treated it like he should have made it for red inquiry. He should have delved into the question of whether it was for delay. He should have delved into is this really what you want to make sure it was unequivocal. He should have given all the advisements about how stupid a thing this would be and there's no way you're going to win your case if that's what you're hoping, things like that. So are you asking for remand for Judge Hatter to take a look and make findings? The government urges that, Your Honor, but I don't think this court has ever remanded in a denial of self-representation and told the district court. Well, I mean this was made on the day of trial when the jury was waiting. So Judge Hatter could have thought that it was untimely, that it wasn't a serious request, that it wasn't an unequivocal request. Why can't we remand for further findings? Well, it definitely wasn't untimely because the rule on that is clear that voir dire hasn't started. Well, it wasn't automatically untimely. Well, no. If the judge had found that it was too late in light of all the circumstances for delay, that might have been appropriate. I'm treating purpose of delay as separate from the timely inquiry. The answer, Your Honor, is trying to reconstruct that, what are we now, five years after the fact? I guess it's three years after the fact. It will be probably going on four by the time we get back there. There's no precedent in this court's case law for doing that, and the idea of reconstructing that years later I just think is not realistic. So I think that's why you can't do that. You're asking for an outright reversal if we think that's a reversal. I am asking for an outright reversal. Then it goes back for a retrial. Yes. And judges can't just tell defendants you don't have the right to do this and then try to fix it later on years later. However, in the Kieferoff, they didn't say, okay, judge, figure out whether there was other reasons that weren't satisfied. It's just not practical to do that. And I don't think there's a single case, a single Feretta self-representation case where this court has ever done that. But we have found requests not to be unequivocal. I think all you've ever done is affirmed district court findings that requests were equivocal. Because this is, I think, the most difficult issue in this case. We're trying to figure out whether there's a reasonable analogy to Miranda warnings when somebody says, I think maybe I need a lawyer, or gee, maybe I'd be better off if I had a lawyer. And we've often said there that request isn't good enough to trigger the right to counsel. An important Sixth Amendment right where you said you've got to be clear. You've got to say, I want a lawyer. Why isn't the same rule applicable here? I think this is a lot more fundamental of a right than Miranda warnings. Than the right to counsel? No, than the Miranda warning. The right to self-representation, I think, is more fundamental than the Miranda warnings aspect. Yeah, but the Miranda warning says you have a right to counsel. So it seems to me we're dealing with the flip side of the Sixth Amendment, aren't we? If you can't invoke your right to counsel without doing it in a straightforward and unequivocal manner, shouldn't it also be true that you can't invoke your right to self-representation without being straightforward? That's a right to counsel, Your Honor, in the interrogation context. That's not the right to counsel or self-representation in the trial context. I understand. Gideon v. Wainwright and, I think, Ferretta are far more fundamental than the right to counsel during interrogation. I mean, they're both important, of course. But I think once, I mean, it got mentioned several times. The other consideration here that I think has to be taken into account is what's he supposed to do when the judge says, I'm not going to allow it? He's supposed to then say, well, no, no, I want to represent myself. You're not, I mean, you know, talk about it. Defense attorneys get nervous enough about telling a judge they want something again when they've been flatly told no. What's a poor little defendant supposed to say when the judge who's going to be sentencing him or trying his case later says no? He's supposed to keep saying it and saying it and saying it? This Court's case law suggests defendants don't have to do that. And I think once this idea got broached. But for the requirement that it has to be an unequivocal request has to mean something, right? And in context, it's more like this guy throwing up his hands and saying, well, I might as well because you're not giving me what I want, which is really a continuance. And then he says, so I can't represent myself? And the judge basically says, yeah. I mean, I think he says it about three different ways. And the judge has already told him no, so what more is he supposed to do? I mean, this isn't a situation. I thought of the hypothetical about a judge who might issue a pretrial order saying, I'm not going to allow any defendant to represent themselves no matter what. And maybe that would be different. But that's not what you have here. He brought up the idea. He said, well, if I'm not going to get more time, if I'm not going to get the victim here, it's hopeless and I might as well just do it myself, get my autonomy. I know you wanted to save a little bit of time. I will do that. I had some things to say on the other issues, which I also think have merit, but I'll save my time. The case was well briefed, so we appreciate that. Thank you. Good afternoon, Your Honors. Saria Bahadu on behalf of the United States. I'll also start with the Feretta issue because that's what it sounds like the panel is most interested in. So just to make clear, this court can affirm on any grounds in the record, and with unequivocality specifically, this court has said in Clark that when assessing unequivocality, courts should consider the whole record. Also, this court has said time and time again. I can't remember these cases right now, but in that case, was there a prior finding by the district court that it was unequivocal? Do you remember? One second, Your Honor. Let me just pull it up. Are you using just cases for the general proposition that we can affirm on any ground on the record, or are you referring specifically to cases in the Feretta context? Specifically cases in the Feretta context. It would be helpful as we look at these cases to deal with the argument that your friend is making. He said, look, if the judge had found that this was an equivocal request, we could affirm on that ground even if he made errors on other grounds. Sure. But the judge never found this to be an equivocal request. He made no findings whatsoever on equivocality or unequivocality. And so the question I have is can we affirm on that ground if the judge didn't even mention that ground? Yes, the court can. Tell me what Feretta case is. Jackson. I think Jackson is the best case. I'm looking at Jackson, and that's what I thought was the best case, but I'm not sure I can tell from Jackson. It's a habeas case. Sure. I'm not sure I can tell what the judge did. I think the best point in Jackson is when the court specifically says, and I'll try to get a page type, but I'm not sure. The right is waived unless somebody articulately and unequivocally asks for it. Well, that. But then here it says here the trial court properly may deny a request for self-representation that is a momentary caprice or the result of making out the facts. Right. No, I understand. Those are all good reasons why I think Judge Hatter could have said here. But then right after that. This is an equivocal request. You haven't made an unequivocal request. You don't pass go. You don't call it $200. We're just done. Yes. I'm trying to find a case where the judge was silent about that, and then we nonetheless. Or said the wrong thing, like you don't have the capability to do it. Sure. I think also I'll get to Judge Wynn's point on that, because I have another case for Judge Wynn there. But right after the court says momentary caprice, it says the record demonstrates that Jackson's request for self-representation was an impulsive one. And I think this is actually the case where defense counsel says that the district court essentially ignored the request entirely or brushed it aside. Here the district court did brush aside the request, and that's because it treated the request as unserious. And I guess what I'm asking, and I just can't tell it from our opinion in Jackson, whether or not the judge. These are all good reasons, the court says, why the judge did not err in denying a request for self-representation. But it seems to me not to say that the judge said, I'm turning you down because it wasn't unequivocal. Well, so I don't think the district court said that. I think the district court, the way that Jackson has been characterized, I would point the court to Hernandez, which talks about Jackson in a footnote. I think it's footnote 10. It talks about how in Jackson the district court ignored the request and did not proceed to the Feretta inquiry because it treated that request as an unserious one. But because it treated, and that's my difficulty with reading these cases now, it says it treated the request as an unserious one.  But do we know that? Because it did not proceed to the Feretta inquiry. So you think that if a court doesn't proceed to the Feretta inquiry, the first question in our mind is without regard to what the court said, was the request unequivocal? Not always. I think the court would look to the entire record, and that's what Clark says. Let's work backwards here.  Maybe you can help us out on this. If an unequivocal request had been made, if Mr. Burks had said in this case, I'm invoking my rights under United States v. Feretta or Feretta v. United States, and I want to represent myself, period, do you agree that the judge's reason for turning him down would be insufficient? I don't think that this judge turned him down based on his legal ability. It's the only reason the judge gave. That's what he said. Well, I think he actually said, you don't have the ability to represent yourself properly, and then a couple lines later he says, I don't think, I'm not going to allow it at this point. And I think properly and I'm not going to allow it at this point do a lot of work in the context of that warning. Do you think that's a finding and that it's being made for purposes of delay? I think at this point it's plausibly read when you combine it with the rest of the record, where, as Judge Winn pointed out, this hearing started off the morning of trial and the first words out of the defense counsel's mouth was, I would like a continuance. Then right after that, we want to talk about continuing representation. Then once the government's Don't you think the judge needs to do better than that if there's an unequivocal request? If there's an unequivocal request? No, I'm turning you down. You're saying, well, let's go back and look at the record and figure out where there would have been good reasons for him to turn him down. But he didn't say that. Well, he brushed it aside because he took it as unserious because this was one of many musings that morning. This defendant was oscillating back and forth all morning. He was grasping at straws. I understand that point. And that's, I think, your strongest argument, that it wasn't an unequivocal request. I've asked you to assume that it was. If he'd said, I want to represent myself, is what the judge said sufficient for us then to say, no, he didn't err in denying him his forever right? We do not believe that. If you want to pluck this out of context and just look at ability to represent yourself, I think then it's not correct to deny. We understand the case law on this. If you cannot deny somebody the right based on their legal ability, we do not think it's clear as day as the other side does. We think all of this has to be read in context. And at this point does a lot of work because it's the morning of trial. And I do want to point to court. There was a time that this defendant did raise self-representation with this district judge. It was in 2017. He mentioned self-representation about three weeks before a March 2017 trial date. And in that setting, the district court took it seriously, slowed down, said this is your right. This is CR 672. And then encouraged him, said if you want to do this, this is something that you are allowed to do as long as you understand the risk. So this is an experienced district court judge who knew this defendant. So are we allowed to take into account the previous history in the case in determining whether this request was unequivocal? I think the court can look at the whole record. It should look at that morning. I'm pointing that as a comparison because this district court knew when the defendant was serious and knew when he wasn't serious. And I know we've been talking in many cases today about the deference owed to a district court who's in the room. This district judge had presided over this case for five years. There were many status conferences, many status conferences where the government wasn't in the room. So this district judge knew this defendant and knew him well. And so this district judge knew that when he was throwing up he would get another musing after all morning of saying, I want to delay, but I want this over. I want to talk about counsel, but I don't want to change my counsel. I want my victim here, but I want this over. So this is just one of many, many musings, and it was not an unequivocal request. When was that prior incident? In March of 2017. When? March 2017, March 9, 2017. Three years before? Three years before when there was former counsel. And the way that hearing ended was the district court encouraged him to talk to his counsel about it, which is what happened. And then the defense counsel at the time represented that there was no definitive resolution made and that they would talk it over some more. And then four days later, the defendant signed a speedy trial act stip to continue the trial. This was when he was represented by Greg Nicolaisen? That's correct. And then fast forward to the morning of trial when he's tried different avenues of trying to prevent this trial from happening, he does throw up his hands and say, I might as well represent myself. Did he request that Nicolaisen, I remember him, his then counsel be terminated? Eventually he did in February of 2019. That's why Nicolaisen was no longer his counsel? Correct, yes. I think it was around February 11 of 2019. He got a new attorney. He did get a new attorney, that's correct. Would you remind me what his request was on the previous occasion? You said it was 276, is that what you said? 672. 672. In the ER. No, it's not in the ER, Your Honor. And I'm happy to submit it. In the clerk's record. It's in the clerk's record. It's in the ER in the docket sheet, which is where I noticed it in preparing for today. And he essentially said, there's a discussion about whether or not to continue the trial. And at this point, the defendant, this is 2019, so about, sorry, excuse me, 2017, so about a year after he was arrested. And they're talking about filing certain motions. The court says, and you want to tell me that you want to proceed on your own. And the defendant replies, I mean, if he would do what I asked him to do now, he can still be my lawyer. But if not, then I'd rather go pro se. And then there's a discussion about going pro se. And the district court says, you have a right to do that. And he walks through, he doesn't go through the full inquiry. He basically says, if that's what you want to do, we'll do that. But then he, essentially, they talk amongst themselves. Staying on this point for a second, your friend says, gee, whatever we think, looking at this record, the judge thought he made a request. The judge was in the courtroom and said, I'm not going to let you represent yourself. Why isn't the judge's understanding that a request had been made enough to trigger the FARETA analysis? Because the judge did not see the request being made. The judge saw this as an unserious request and brushed it aside. And in Hernandez, this court has said that when a district court brushes aside a request and doesn't proceed to the full FARETA hearing, that actually is indicative of the court treating it as an impulsive request. And I would point the court to some other decision where it does. It's a little more problematic than that in this particular case because, I mean, I can certainly understand with the judge's knowledge, extensive knowledge of the defendant, they can say, well, you know, you think you can change lawyers at any time given the prior history. But he didn't just brush it aside. He gave a reason that is not an appropriate reason. Like, I don't know why he did that. Maybe it is his way of brushing it aside, but we just have the benefit of the record. And the reason he gave was, I don't think you have the ability to do it. We do think that the reason should be read in context. But even so, this in Marshall, we think is probably, this is the case that I wanted to refer you to. We do think that's a case where a trial court had said, I don't think you have the ability to do so properly, something along the lines of legal competency as a basis for denying the right. Then the California Court of Appeals, this was a habeas decision when it came to this court, California Court of Appeals ruled on an alternative ground, one that the trial court did not address and said that the request below was untimely. And then this court, sitting on habeas review, said the court can affirm on any basis in the record. The California Court of Appeals can. So that's probably the best case where there might be this language that's saying legal competency. Well, that means it's not against clearly established federal law at the time of that decision. It doesn't mean that it's correct. We're reviewing this without the AEDPA overlay, aren't we? That's true, but it also means that there were substantial facts in the record that the facts had established that alternative holding. And it's more for the point that this court said that the California Court of Appeals can affirm on any basis in the record. And there are multiple instances where this court, when assessing Ferretta, it is looking at the record. In Telus, for example, in assessing timeliness, the court found that the record evidenced delay. In Farias, also assessing timeliness, this is reversing a district court, but it still said that the district court did not identify circumstantial suggesting delay, and nor can we find in the record. So this court, as well as Jackson, the record demonstrates. And then even the cases at the defense sites, if you look at Van Linn, there the court acknowledged that nothing in the record suggested that the district court would have denied or could have denied on timeliness grounds. So especially with equivocality, the court has said many times that it should consider the whole record. And, of course, there's the overlay of indulging in every presumption against the waiver of the right to counsel. And that's important because in Adams, the court said that we have this equivocality requirement for a reason, to ensure and to protect criminal defendants who simply just muse about the benefits of self-representation and don't inadvertently waive the right. Can you address the obstruction of justice? Because it seems to me that Madera Gallegos had worse facts. If I've got my cases right, I think that's the one fleeing the country to avoid for nine months before arrest, to avoid arrest. And so how do you grapple with that case? I know he got a below-guideline sentence, but counsel's relying on our cases that says if you start at the wrong point, it could potentially make a difference. And we've remanded in circumstances like that. Right. We do think these are two spectrums. There's two cases on the different sides of the spectrum. You have the Madera Gallegos, which is supporting defense counsel's position, and then you have Mandela, which is supporting our position. We don't think that the facts are like one or the other. We think that the facts are closer to Mandela. In Mandela, the defendant knew that the authorities were looking for him. How did he know that the authorities were looking for him? In Mandela. No, in our case. In our case. So he was at the hospital when they were about to serve the search warrant. Sorry, excuse me, the arrest warrant. So when he, about a year later, when he said to a tipster, I was hiding from authorities, it's because he knew that we were coming to issue an arrest warrant. He was at the hospital, so they didn't go up and did they go up and talk to him? They tried to, but he had left before. They went to the hospital to serve that arrest warrant. My understanding is there was communication leading up to. What is your understanding based on? Only based on the fact that the only way we knew he was at the hospital was because there was communication. I don't think that there's a place in the record where we put in the extensive communications that were going on, so I acknowledge that. Was he counseled at that time? Because usually when somebody's counseled, then you make arrangements with counsel. There's nothing like that here. No, he was not counseled at that time. But we do think that. So you think that we can reach the inference on this record that they must have communicated with him regarding his location, that it wasn't going to be a surprise, we know he's going to be here, so let's go nab him? I think so, because eventually when he tells the tipster, I'm hiding from authorities, he knew. Well, he knows by then. He knows by then. So can we infer from that that he knew at the time that he fled? Well, at a minimum, there is in the record the fact that the law enforcement was trying to arrange a surrender with the family members. So I think that on this record, on top of that, I do want to say... Right, so I don't think that there's on this record sufficient evidence that he knew they were going to show up at the hospital. I think that inference, there aren't enough facts here to reach that inference. So at some point, likely through family members, he knew they were looking for him, and he's just not going to cooperate. That's not enough for obstruction, is it? Well, in Madera Gallegos, the point there was that there were no aggravating circumstances, and the court said specifically there's no evidence that once found they, the defendants who had fled to a different country, made any efforts to impede law enforcement. We think that the defendant knew he was under surveillance or knew that he was wanted, essentially, and there is evidence that once found that there were efforts to impede law enforcement. He relocated to a new city. He started a new life. And absent the tipster, we would not have been able to find him. He was down in Victorville. In Victorville. That's correct. Right. This also is reviewed for abuse of discretion. I think counsel cited a case that predates Gasco-Ruiz. So we do think that this is a reasonable determination of the facts. We don't think it's governed by Madera Gallegos squarely. We think it's closer to Mandelo because there is, at a minimum, this is not something where a defendant is fleeing in the aftermath of a crime. And in Madera Gallegos, that's exactly what it was. It was minutes after a by-bus had occurred, and these two defendants had fled to another country. One of the guideline comments, I think it's, I can't remember exactly which one it is, talks about what's not covered or what generally is not covered, and it's avoiding arrest. And isn't that what he was doing here? He was just hanging out. He was setting up a new life in Victorville, trying to avoid arrest. Right. But we do think that it was willful because he knew, and he did it in a way where he was trying to actively hide from authorities. So that's the added factor, that it was willful? Yes, I think so, and that's what the probation officer found in one of the addendums as well. So you think it's enough for sufficiency on this enhancement? Based on the- If he knew that people were looking for him, and he went to some place where he thought he couldn't be found. If he's impeding authorities, which I think was the factor missing. That's the only impeding. That's the entire world of my hypothetical. I know they're looking for me, and I'm not going to make it easy on them. I'm going to go to Victorville, where no one will look for me. Is that enough? We think on this record, under an abusive discretion standard, that we do think it's enough. Is that sufficient? Those are the only facts. Is that sufficient? Well, yes, because in this record, once he was found, they knew he was at the hospital. So it's similar in the sense, it's not similar in the sense- Well, the hospital thing doesn't really carry a whole lot of weight with me. It's just your argument seems to run contrary to the sites, the one where the defendant was using the alias to evade law enforcement capture. And we said there, and I'm quoting, to disappear from the jurisdiction and not disclose one's whereabouts to the government does not warrant an enhanced punishment. That seems like a pretty clear ruling to me. Right. I mean, that ruling does count against us, but we do think we're closer to Mondelo in the sense that we were almost about to arrest him. There were efforts made, and then once found, he went and relocated to another city. Well, did he do anything in that other place to obstruct, other than live there? There's nothing in the record. He had a phony name. See, I could understand if he did some things in that other place that then made it much harder to find him. But was he required, in your view, to wait at the hospital for them to arrest him? Sorry, say that again, Your Honor? Was he required to wait at the hospital for them to arrest him? Under those circumstances, I mean, if a defendant knew that an arrest warrant was coming, it's probably best for a defendant to not flee the scene and to surrender. I'm asking you a legal question, not the advice you'd give to a defendant. Is it your view that if he had picked up, learned that they were after him, and he decided not to remain at the place where he was, but to go to a different place, and that's all that's in the record, that's enough to support the enhancement? I think that's harder to support the enhancement. Well, okay. Thank you. Unless the Court has any other questions, we ask that the jury's verdict be affirmed and the sentence as well. Thank you. Thank you, Counsel. I'm going to try to make two quick points in the instruction and then get to the self-representation. First of all, I'm forgetting. First of all, I want to direct your honors to Madera-Gallegos. Quote, after his arrest, Felipe admitted that he knew the agents had been searching for him because of the heroin deal, unquote. So that existed in Madera-Gallegos as well. Second, your honors, there was no indication that Mr. Burks knew when he was at the hospital that they were looking for him and left the hospital. The suggestion is he found out sometime after they went to the hospital and he had already left because he was done at the hospital. So there's no indication. The knowledge about them looking for him came sometime later that's not clear. On the self-representation, your honors, there are not any cases. The Clark case that the government cited, if you look at it, the state courts there, it was a habeas case, found that the request was equivocal. In the Jackson case, there was certainly no finding of a wrong reason, and the trial court basically just brushed past it, as the Hernandez opinion recognizes in a footnote. The government says, and I think I'm quoting this correctly, this district judge knew when the defendant was serious and knew when he was not. Well, he took it seriously here and said, I'm not going to allow it. So I would suggest that that cuts in our favor, not the government's favor. This argument about the prior occasion in 2017, the government didn't argue that at all in its briefs, and I don't think that really changes anything anyway. The government said there are multiple times where this court has looked at the record. When this court has looked at the record, it's to affirm and find that there was a basis for a district court or lower court finding that the request was equivocal. The court has never gone off and done that on its own. In fact, in the Kieferoff and the other cases I cite, it said, we're not going to do that. And I think you especially shouldn't do that when the record here is so complex that the government has to spend six pages of its brief describing the record. Thank you very much, Mr. Gunn. Thank you to both sides for your very helpful arguments this afternoon. This matter, U.S. v. Birx, is submitted and will issue a decision in due course. That concludes the argument calendar for this afternoon. We'll be in recess until tomorrow morning. Thank you.
judges: PAEZ, NGUYEN, HURWITZ